### R. H. JONES v. THE STATE.

No. 1219. Decided May 19, 1897.

Motion for Rehearing Decided June 23, 1897.

**1. Preparation of Record for Appeal.**

The court again calls attention to the fact that care should be taken by the lower courts in preparing a record for appeal, so that the points may be clearly presented without unnecessary prolixity or confusion.

**2. General Rule as to Cross-Examination of a Witness.**

The general rule is, that if a party, in the cross-examination of a witness, departs from the matter elicited in chief, he makes the witness his own witness; and when-

ever the matter is not pertinent or germane to that elicited in chief, the witness becomes the witness of the party attempting to prove such matter.

## 3. Wife as a Witness—Cross-Examination of.

A wife can be a witness for her husband, but not against him; and, when she is a witness for him, the State can legitimately cross-examine her as to the facts sworn to by her on her direct examination. But on such cross-examination, if the State is permitted, over defendant's objections, to prove other independent facts not elicited on the examination in chief, it thereby makes her a State's witness against her husband, which can not be done. And if the matters so elicited on cross-examination are of a material character, it will constitute reversible error.

## 4. Murder—Insulting Words and Conduct to Wife—Wife as Witness—Evidence Supporting Her Testimony.

On a trial for murder, where the defense was insulting words and conduct by deceased towards the wife of defendant, which she had communicated to him, and the wife, as a witness, has testified to such insulting conduct of deceased towards her; and the theory and the evidence on behalf of the State was to the effect that her testimony was prompted by an improper motive, was recently fabricated and manufactured solely to aid the husband in his defense; Held, it was error to exclude the testimony of witnesses going to establish the fact that, before the homicide, she had stated to them the facts as testified to by her. Such testimony was admissible to support her testimony, and also for the purpose of showing that the husband believed her statements, and committed the homicide in consequence of them.

## 5. Same—Evidence.

Where the defense to a charge of murder is insulting conduct towards a wife, it is competent for defendant to prove by a witness, as original evidence, that prior to the homicide his wife communicated the insulting conduct of deceased towards her to said witness, and that he in turn told it to defendant.

## 6. Same—Evidence—Reputation of Deceased.

On a trial for murder, where the defense was insulting conduct of deceased towards the wife of defendant, which had been communicated to defendant by his wife prior to the killing, it is competent for defendant to prove that the general reputation of deceased for chaste conduct towards women was bad, inasmuch as such evidence tended to show that he had reason to believe, and did believe, the story told him by his wife. In addition to this, defendant had the right to prove that deceased's general reputation was bad, and that he was informed of such reputation.

## 7. Same—Evidence—Statements and Declarations of Deceased Prior to the Homicide—Hearsay.

On a trial for murder, where the defense was insulting conduct towards the wife of defendant, which had been testified to by the wife as a witness, it was error for the court to permit the State, for the purpose of disproving her testimony, to prove by a witness that subsequent to the date of the alleged insults he saw a woman in the office of deceased, and that deceased told him it was Mrs. Jones; but there was no testimony identifying said Mrs. Jones as the wife of the defendant. Held, the testimony was purely hearsay, and inadmissible.

## 8. The Rule as to Conclusions Deducible from Facts.

The rule is, that no conclusion can rise higher than the facts from which it is made, and where a conclusion is sought to be made, the facts upon which it is based must be clearly proved.

### ON MOTION FOR REHEARING.

## 9. Wife as a Witness—Examination and Cross-Examination—Rules as to.

If the husband is upon trial, and his wife is a witness, and she should swear to facts injurious to him in answer to questions propounded, he could not complain; but if she swears to certain facts and circumstances, the cross-examination must be confined to the matter elicited in chief. Everything which is legitimate for the purpose of testing her knowledge of the facts sworn to, her bias, her prejudice, in fact any matter that goes legitimately to discredit her, is admissible on cross examination. But if the State leaves the matter testified to in chief, and proposes to prove inde-

pendent criminative facts against the accused, this would not be a cross-examination of the witness. When the matter is departed from, the witness ceases to be a witness for her husband and becomes a witness for the State. See opinion for a discussion in extenso of these rules.

**10. Same—Murder—Res Gestae.**

On a trial for murder, where the defense was insulting conduct towards the wife, and the wife has testified to such insulting conduct, and that her husband and deceased had been friendly until she communicated the facts of the insulting conduct to her husband; and it was contended as part of the res gestae, that the State had the right to prove, as was done, by the wife on her cross-examination, matters pertaining to the disposition of her property, and deceased's supposed connection therewith; and the squandering of her property by her husband; Held, the rule as to res gestae is, that any relevant fact to the main fact is its res gestae until you extend it into a field in which the fact has no probative force. But it would be a most remarkable and novel application of the doctrine of res gestae to extend it to the matters mentioned, and that would permit the wife, in the face of the statute, to be made a witness against her husband in regard to any matter relevant to the case, whether germane to what she had sworn in chief or not.

**11. Same—Right to Support a Witness in Cases Other than of Impeachment by Contradictory Statements.**

The courts of this State have held, in an unbroken line of decision, that where a witness is attacked by showing contradictory statements, the witness can be supported. It is also well established, that when a witness is attacked by showing that he has testified corruptly, or has recently fabricated his testimony for a purpose, he can be supported by proof that he made the same statements before the impugned motives could have existed, and that his testimony was not fabricated, because he had told the same story before.

**12. General Reputation of Deceased as Evidence.**

On a trial for murder, where the defense was insulting conduct towards the wife, which she had communicated to her husband, the general reputation of deceased as a man of unchaste and lecherous habits is admissible in evidence upon the issue as to whether defendant believed what his wife told him; and the jury had the right to know his general reputation, in order to determine whether defendant believed the story told him by his wife.

**13. Statements and Declarations of Deceased—Hearsay.**

On a trial for murder, where the defense was insulting conduct towards the wife of defendant, the testimony of a witness to the fact, that subsequent to the date of the alleged insulting conduct he saw a woman in the office of deceased, and that deceased told him she was the wife of defendant, was hearsay, and inadmissible.

APPEAL from the Criminal District Court of Dallas. Tried below before Hon. CHARLES F. CLINT.

Appeal from a conviction for murder in the second degree; penalty, twenty years imprisonment in the penitentiary.

This is the third time this case has been before the court on appeal. The two former appeals will be found in Ex Parte Jones, 31 Texas Crim. Rep., 422, and Jones v. The State, 33 Texas Crim. Rep., 492. The main facts are elaborately reported in the first of these cases, and the other important facts not stated in that case will be found below in the briefs of counsel and the two opinions in this case.

The defense was that the deceased, Veal, raped the wife of the defendand prior to his marriage to her, and that subsequently after her marriage to defendant deceased twice came to defendant's house, and was guilty of insulting conduct towards his said wife. That these facts were communicated to the defendant in the fall of 1891, and that the killing oc-

curred upon the first meeting with the deceased, as the result of sudden passion, engendered by the cause above recited.

The theory of the State was that the killing did not occur upon the first meeting, the contention of the State being that the defendant saw the deceased at the Fair Grounds, in Dallas City, on Monday, the day before the homicide.

The State also relied upon the alternative theory that the moving cause of the homicide was a property motive, and disputed the truth of the adequate cause relied upon by the defendant.

The errors relied upon for a reversal of the judgment are presented by bills of exception contained in the record, and may be summarized as follows, viz: Errors and omissions in the charge of the court; refusal of requested charges and continuance, and erroneous admission and exclusion of evidence.

*R. B. Seay, J. C. Muse, S. H. Russell,* and *Miller & Williams,* for appellant.—Upon the error in permitting the cross-examination of the wife as a witness upon matters not germane to any matter about which she had been examined by defendant, and in permitting the State to prove by her matters foreign to anything elicited from her by defendant, they cited:   Wills. Crim. Stats., secs. 2441-2443; Washington v. State, 17 Texas Crim. App., 197; Johnson v. State, 28 Texas Crim. App., 26; Johnson v. State, 27 Texas Crim. App., 135; Owen v. State, 7 Texas Crim. App., 173; Bluman v. State, 33 Texas Crim. Rep., 43; Creamer v. State, 34 Texas, 329; Greenwood v. State, 35 Texas, 587; Dill v. State, 1 Texas Crim. App., 282.

The court erred in refusing to permit defendant to testify, in his own behalf, that within a few days after the communication to him, by his wife, of the rape and insulting conduct of Veal, that he, defendant, told the witness Kendall of said communication and all the facts communicated by the wife; that he was in a nervous and excited condition of mind, shed tears, and was incapable of cool reflection.   That Kendall expressed his disbelief of the statement, and stated that he had known defendant's wife since she was a child, and would not believe that she had been raped or insulted by any man unless he should hear it from her own lips; that on the same day said Kendall came to defendant and communicated to defendant that he had talked with defendant's wife and that she had informed him of the rape and insults by Veal, and said Kendall then stated to defendant "every word that your wife has stated to you and to me is true—Veal did everything she says he did. I know her to be incapable of telling a lie; a purer, better woman never lived, and I believe every word she says about it;" and that repeatedly from then until within a few days of the homicide the defendant talked with said Kendall about said communication aforesaid to him from his wife, was always greatly excited and in a distressed condition of mind, and was never cool and calm in talking of the same, and avowed his belief in the truth of the said communication made, and in the fact that Veal had

raped his wife, and after her marriage had insulted her by his lecherous visits, and said Kendall reiterated to defendant his belief in the truth of the communication so made by defendant's wife, and that defendant in said conversation talked with Kendall about the reputation and character of the deceased.

And the court also erred in refusing to permit the defendant to prove by his wife and the said T. G. T. Kendall that defendant's wife in the fall of 1891, within a few days after her communication to the defendant of the rape by Veal and his subsequent insulting visits to her, communicated to said Kendall the same facts detailed to the defendant relative to said rape and subsequent visits of Veal, and by said Kendall that he had the conversations with defendant in reference thereto, as sought to be testified to by the defendant, and offered to prove by said Kendall all the facts hereinbefore alleged, which was rejected.

And defendant offered to prove by himself and wife that in the spring of 1892 that his wife made the same communication relative to the said rape and insults by Veal to Mrs. Cockrell in the presence of the defendant, being the same Mrs. Cockrell with whom his wife resided at the time of said rape aforesaid, and that said Mrs. Cockrell then stated to defendant that she believed said communication to be the truth. The court refused to permit any testimony as to said facts or any question to be asked concerning the same, or any reason to be stated as to admissibility of said testimony.

Said testimony was relevant and competent and tended to corroborate the truth of the testimony of the defendant and his wife, and that his defense was not fabricated after the homicide, and tended to establish his belief in the truth of the communication of his wife, and that the insults to her was the real cause of the homicide. Penal Code, art. 705 [600]; Jones v. State, 33 Texas Crim. Rep., 495; Utzman v. State, 32 Texas Crim. Rep., 428; Hammond v. State, 28 Texas Crim. App., 413; Craig v. State, 30 Texas Crim. App., 619.

The court deprived defendant of the right to prove the general reputation of deceased as a lewd, lascivious, and licentious man, and his general reputation for insulting conduct to, and assaulting virtuous and chaste woman, married and unmarried. The testimony was competent as tending to support and strengthen the defendant's belief in the communication of the wife to him. Childers' Case, 30 Texas Crim. App., 193, 194; Bell's Case, 20 Texas Crim. App., 450; Brumley's Case, 21 Texas Crim. App., 240.

Belief in the truth of the adequate cause is the hinging point in manslaughter, as is belief of danger from overt act the test of self-defense. Upon this theory, threats by the deceased and proof of his reputation and habit of going armed are admissible to characterize the overt act in the belief of the defendant. Belief in the truth of the adequate cause in manslaughter is the corrollary of belief of danger from overt act in self-defense, and proof of reputation and facts assisting belief in either is equally admissible and competent. The defendant had the right to

pass upon the credibility of the matters told him by his wife, in the light of Veal's general reputation as being that of a libertine. Whether the woman was married or single, chaste or not, and his personal knowledge of specific acts, and that such was Veal's character. Besides, it was but natural that a jury would require corroboration of the truth of such matters, deemed upon the surface, by the mind unacquainted with the facts, incredible.

It was error to permit the State to prove by S. Q. Richardson, in rebuttal, that about 1885 he saw a woman in the office of the deceased in Dallas in conversation with him; that the deceased came to the door and informed witness that he could not attend to his business then, that a lady was in there, and deceased told witness her name. Deceased told witness that it was Mrs. Jones, and what she was there for. Defendant objected to the questions eliciting said testimony, because improper and leading, and to the testimony because irrelevant and hearsay, and the same, if true, did not show that the Mrs. Jones referred to by the witness was the wife of the defendant; and further, that said testimony was not competent, unless it was shown that the defendant knew of such visit to the office of Veal, if it was in fact his wife, and there was no proof of such fact of his knowledge, and said testimony was prejudicial and hurtful and was an impeachment of Mrs. Jones upon collateral matters drawn out by the State in its cross-examination of her upon matters that were not touched upon or inquired of by the defendant upon the direct examination of his said wife. Wills. Crim. Stats., secs. 2443, 2444; Washington Case, 17 Texas Crim. App., 197; Johnson's Case, 27 Texas Crim. App., 135; Johnson's Case, 28 Texas Crim. App., 26.

*Mann Trice*, Assistant Attorney-General, for the State.—Answering the query propounded by the court, did the trial court err in permitting the cross-examination of Mrs. Jones (wife of appellant) concerning the matter shown by the fifth assignment of errors, bill of exception number 3: and in refusing to permit appellant to corroborate his statement, and the statement made by his wife, by the testimony of Kendall to the effect that she had told him (Kendall) of the rape and insults by Veal, and that she had also told Mrs. Cockrell of same, and that each of them gave credence to her story.

1. The gist of appellant's contention is that the cross-examination of the wife elicited inculpatory facts against him; therefore, the evidence thus elicited is prohibited by the second paragraph of article 735, Code of Criminal Procedure, inhibiting either spouse from testifying against the other.

An examination of the bill of exceptions seeking to raise this issue furnishes a complete answer to this proposition, in this: There is not an inculpatory fact or circumstance deposed to by said witness. She stoutly denied ever meeting Veal on friendly terms after her marriage with Jones, or that she ever asked his advice about conveying her property to her son on the day prior to her marriage with Jones, or that she on

several occasions visited Veal's office after her marriage to Jones, and long after the alleged rape and insults by Veal; or that Jones had sold her property and squandered her money; or that her husband got mad at Mitch Gray for his supposed connection in persuading her to convey her property to her son so as to place it beyond the reach of Jones. Her testimony shows a studied avoidance of stating any fact that would impute ill will on the part of Jones towards Veal, save and except the alleged outrage upon her and his subsequent visits to her. On the contrary she swore that Jones was a friend and defender of Veal up to the time she told him of Veal's conduct toward her, and by every possible means endeavored to show that the sole cause of this most atrocious and deliberate murder was occasioned by Veal's insult to her.

Therefore, no inculpatory fact having been deposed to by her, the provisions of the above quoted statute were in no sense of the word violated.

Can it be said, that the mere asking of a question which tended to elicit a criminative or inculpatory fact is cause for reversal? Certainly not. It is the introduction in evidence of illegal testimony that affords ground for reversals, and this is not shown. It is not the policy of the law, and I apprehend will never be, to place the destiny of any litigated cause within the power of counsel to control by the mere asking of a question the answer to which might possibly be inadmissible. An analysis of the testimony of Mrs. Jones introduced by appellant and her answers to questions propounded by counsel for the State, virtually place appellant in the position of asking a reversal by reason of the questions propounded rather than the giving in evidence of any fact prohibited by law.

But, should it be held (which I do not apprehend) that the inhibition against one spouse testifying against the other extends to any inquiry calculated to elicit prohibited inculpatory matters, then I contend that the bill of exceptions does not show a solitary question propounded to Mrs. Jones that was not strictly permissible under well known and permanently establish rules of law governing the cross-examination of a witness, whether that witness be either husband or wife, or whether any such relation existed or not. By article 731, husband and wife are made competent witnesses for each other. The term "competent witnesses" here used and as generally understood implies that when a witness takes the stand and deposes to any fact, the right of cross-examination of such witness is accorded, and the same rules which govern all other witnesses on cross-examination apply. Generally speaking, the cross-examination should be confined to a traverse of the matter brought out on the examination in chief. This general rule, however, is not arbitrary and applicable to all cases, for it is well settled, that in order to show the bias or prejudice of a witness, and as affecting credibility, a broader range is allowed on cross-examination; and matters pertinent to the main issue may be inquired into for the purpose of impeaching the witness or as tending to affect his credibility.

As was said by our Supreme Court, 11 Texas, 133: "We are aware that some dicta are to be found, from respectable names, that the cross-examination must be confined to the questions propounded and answered on the examination in chief; but this is not believed to be established doctrine on the subject. We believe that it is regular to ask a witness on a cross-examination any question that may be pertinent to the questions to be decided by the jury; and that any fact, to show a bias on the evidence of the opposite party, is admissible, whether the same be offered by the examination in chief or cross-examination."

It is well settled that the common law rule which confines cross-examination to matters inquired about on examinations in chief, does not obtain in this State. Rhine v. Blake and Jenkins, 59 Texas, 240; Morris v. State, 30 Texas Crim. App., 116; Brookin v. State, 26 Texas Crim. App., 121; Johnson v. State, 27 Texas Crim. App., 163; Miller v. State, 28 Texas Crim. App., 445; Wicks v. State, 28 Texas Crim. App., 448.

The Pennsylvania statute is about the same as ours on the subject of the husband or wife's testimony for or against each other. The Supreme Court of that State, in construing same apropos to the question here discussed, says: "But the language of the Act of April 15, 1869, is very explicit, that neither interest nor policy of law shall exclude a party or person from being a witness in any civil proceeding. And the proviso only excepts the case of husband and wife testifying against each other. It is argued, as I understand, that as the wife must be subjected to cross-examination, she may thereby be compelled to give testimony against her husband. But so may her testimony in chief be when offered in behalf of her husband. He may have utterly misapprehended the effect of it, or indeed may have been mistaken as to what it would be. The act in providing for the competency of the witness for the party for whom she is offered, not as to the effect of her testimony. She is offered for her husband and on his behalf. When admitted, as by the act she must be, her husband must take all the risks of what her evidence will be, whether upon examination in chief or cross-examination." 77 Pa. St., 26.

When this question was first presented in the courts of this State, the right to cross-examine the wife or husband was questioned. The Supreme Court in answering this suggestion said: "We are unwilling to believe that the Legislature intended thus recklessly to strike a fatal blow at the very foundation of all judicial investigation and truth, and open a wide door to error, fraud, and perjury. The principal object of a cross-examination is to test the truth of the evidence given on the examination in chief; to sift the truth from error, prejudice, and ignorance, and to present to the court and jury that which is the true measure of justice and equity. We are unable to see how a cross-examination of the wife properly understood could be construed into testimony against her husband, and more especially if the wife has testified to nothing but truth; or if she has testified falsely, then truth, justice, and law demand that she should be exposed regardless of consequences." 34 Texas, 175; Contra, 32 Texas, 165. If, then, she can be cross-examined, the same lati-

tude should be allowed as in the cross-examination of any other witness. As said before, Mrs. Jones having testified that appellant was a friend of Veal up to the time she communicated the insult to him; that she never saw or met Veal after the alleged outrage upon her, except on the specified occasion when he came to her house, and that he was loathsome in her sight; and generally, that the sole cause of Jones killing him was on account of the outrage upon her, the highest consideration of justice demanded, that if this story was not true, and another and different state of facts existed and operated upon the mind of Jones, that caused him to take the life of Veal, the jury should have been informed of the truth. Therefore, if she knew of any cause why Jones should have disliked Veal, that is, if the dislike was engendered by reason of his supposed connection with the conveyance of her property before marriage, it was competent to show same by her as tending to affect her credibility. To this end she was questioned by the State. She denied every fact tending to show any other light on the transaction, other than the theory advanced by her story.

The predicate being thus laid, the State proceeded to contradict her by showing that instead of Jones being friendly with Veal up to the time she told him the story of the rape, he had been cursing and abusing and denouncing Veal for ten or twelve years prior thereto. That instead of Veal being repulsive and offensive to her, and that she never met him but twice, then at her house, that she had repeatedly been in his office and conversed with him when there was no apparent disposition on her part to avoid him, as indicated by her testimony.

This impeaching testimony was clearly admissible for the purpose, and was so limited by the court in his charge to the jury, that it could not be considered as evidence against Jones, but simply to be considered by them in so far as the same might affect the credibility of Mrs. Jones. This practice is authorized by an unbroken line of decision in this court. That the contradiction of her on these important and vital questions was a crushing blow to the defense there can be no doubt. But defendant had placed her on the stand for the purpose of eliciting from her evidence that would reduce his crime to manslaughter. Therefore, justice demanded that if her story be true defendant should not be convicted of any higher grade of crime; if her story was untrue, then the penalty affixed by law should be meted out to him for his offense.

While the cross-examination of this witness laid the predicate for the State to show a fabricated story on her part, it can not be said she gave evidence of any independent fact against defendant; that the effect of the fabrication being shown by other and different witnesses tended to minimize her credibility before the jury, is not disputed. As said in Ballentine's Case, 77 Pennsylvania, supra, the law only provides for the competency of a witness, not for the effect of her testimony. Defendant assumed that risk when he placed her on the stand.

2. In regard to the second question, could Mrs. Jones be corroborated by showing that she made the same statement to Kendall and Mrs.

Cockrell, as to Veal having raped her, that she claims she made to Jones? It should be borne in mind that the first statement or claim that Veal had ever raped or insulted her was made more than twenty years after the date of the alleged outrage? Under some circumstances it is permissible to corroborate the prosecutrix by statements made by her recently after the assault; but I am unable to conceive upon what theory or rule it would be permissible to do so, when more than twenty years had elapsed between the assault and the statement, and when no effort had been made to impeach the witness, by proof of bad reputation, or by showing contradictory statements made by her.

The rule in reference to corroborating a witness by showing similar statements made, is limited to cases where it is sought to impeach said witness by showing statements made contradictory of the one made while testifying. Ricks Case, 19 Texas Crim. App., 309; Walker v. State, 17 Texas Crim. App., 16; 23 Texas Crim. App., 503; Williams v. State, 24 Texas Crim. App., 637; 27 Texas Crim. App., 198; 31 Texas Crim. Rep., 508; Bailey v. State, 9 Texas Crim. App., 98; Whart. on Ev., 571.

As stated by Judge White in Bailey's Case, supra: "To extend the doctrine, however, to witnesses who are not impeached, would result in making a witness' credibility depend more upon the number of times he had repeated the same story than upon the truth of the story itself." There was no effort made to show that Mrs. Jones had never made the statement to appellant, or that she had made any contradictory statements, nor was there any effort to impeach her reputation for truth and veracity. Therefore, no predicate being laid, under no authority to which I have had access could she be corroborated in the manner indicated. But concede for the sake of argument that different statements had been shown and a complete predicate in that regard had been laid, there is another well known rule when applied to the statement made by her, which, in my judgment, should have been sufficient reason for refusing the corroboration offered; that is, "if her sworn statements are of doubtful credibility, those made without the sanction of an oath can not corroborate them." Whart. on Ev., 570; Sidelinger v. Bucklin, 64 Me., 371. It would indeed require a degree of credibility not common to ordinary men to give credence to the story that a rape had been committed under the circumstances detailed by this witness. It is possible that other circumstances than those appearing in this record may have been detailed to the witnesses, who, it is alleged, believed the story. Unless such was the case, it surpasses all understanding how a belief of the story could arise.

The gist of her statement is: "While I was living with Mrs. C., during my widowhood, Captain Veal outraged me. During that time Captain Veal came there that evening and remained over night. I met him in the parlor before night, as I had done several time before. I generally entertained him when he came, while Mrs. Cockrell was looking after supper. There were but three ladies in the house, Mrs. C., the housekeeper, and myself. There were two small rooms adjoining mine.

Captain Veal occupied one of these rooms. In the night I was awakened by either a touch or a noise. I saw standing by my bed a white object. I knew it to be a man. I was frightened. When I saw him standing there I raised up quickly, and says, 'Oh! go away.' He kept standing there, and put his hand out to mine and said, 'Hush; they will hear you.' I was almost paralyzed with fright, but I seemed to realize his object and I threw myself backwards, and threw my arms around my baby, but he pulled me away and accomplished his object. I scarcely remember what I did after I threw my arms around my baby, except that I felt he was pulling me away. I was not conscious at the time I was outraged, but I knew he outraged me only as a woman can know it." There was no outcry made, though it appears several other persons occupied rooms upstairs, and some downstairs. Although she met Veal the next morning and frequently after that, no person was ever informed of this remarkable rape for more than twenty years after it is alleged to have occurred. It does not even appear that the baby was awakened; nor does any threat or demonstration showing an attempt at violence appear. If these facts constitute rape, then I do not understand the meaning of that term as defined by law, or its popular and accepted signification. Therefore, her sworn statements are of such doubtful credibility as tending to establish rape, her statement made without the sanction of an oath should not be received to corroborate it. Whart. on Ev., 570.

It matters not how often she may have related this transaction, if she had told everybody in town about it, it would add nothing to the verity of the statement. If it be conceded that it was rape, that, considered alone, under the circumstances would not constitute adequate cause. Ex Parte Jones, 31 Texas Crim. Rep., 422. But when considered in connection with his subsequent visits to Mrs. Jones, if same were lecherous, or Jones believed them to be, then, considered together, adequate cause may have existed. The trial court gave full and fair instructions on this as well as every phase of the case made by the evidence. If it be conceded that Jones believed this remarkable story as to her being raped by Veal, before his marriage to her, that, in law, would not constitute adequate cause and reduce the killing to manslaughter; but the further fact of insult to her during her marriage with him should, according to the opinion heretofore rendered by this court, be added and considered in order to reduce the killing to manslaughter. Now, it will be observed that there were no restrictions thrown around appellant in making legitimate proof on the latter phase, nor is there any complaint made on that line.

Looking to the exclamations and declarations made by Jones at the time of the killing and before the full line of defense had been determined upon, it is made to appear that the alleged rape was the pretended cause operating upon his mind when he killed Veal, which of itself would not reduce the killing to manslaughter.

38 Texas Crim. App.—7

On the trial appellant had the benefit and protection of every known rule of law, and was ably represented by experienced counsel. No reversible error appearing, this judgment should be affirmed.

DAVIDSON, JUDGE.—Appellant was convicted of murder in the second degree and given twenty years in the penitentiary; hence this appeal.

The record contains something over 300 pages of typewritten matter, a great deal of which is absolutely unnecessary to a proper understanding of the points in the case necessary to be reviewed by this court. We have repeatedly called attention to the fact that care should be taken by the lower courts in preparing a record for this court, so that the points in the case may be clearly presented, without unnecessary prolixity or confusion. To make a record in the lower court containing a great deal of useless matter is an idle consumption of time, tending to produce confusion, requiring great labor in the preparation of such a record, and is a draft upon the time of this court in reading, analyzing, and dissecting the same so as to ascertain what essential matter the record contains. And we again call attention to this practice.

After a painstaking and exhaustive perusal of the voluminous record, it occurs to us that the only questions that require a discussion and reviewal by this court, necessary to a proper disposition of this case, are as follows: First. The action of the court in permitting a cross-examination of Mrs. Jones upon matters, as insisted upon by appellant, not drawn out from her on the examination in chief, and not pertinent to such examination. Second. The action of the court in refusing to permit the appellant to prove by the witness Kendall what defendant and his wife may have told him with reference to the alleged insults of deceased towards her. Third. The general reputation of deceased with reference to his being a man of chaste and virtuous habits and conduct towards women, or otherwise. Fourth. The admission of the testimony of S. Q. Richardson, as to seeing a woman in the office of Veal during the year 1885, and that Veal told witness that it was Mrs. Jones, etc.

In order to a proper understanding of these questions, we will summarize the case sufficiently to show their bearing. The evidence on the part of the State tended to show an unprovoked murder. The killing occurred in the city of Dallas during the fall of 1892, while the Dallas Fair was in progress. On the morning of the homicide, Veal, the deceased, and several others, were in a room in the third story of the Gaston building on Commerce Street, preparing some data or program in connection with the Confederate Reunion to take place at the Fair. Veal was busy at the time, writing. Defendant came upstairs, walked into the room, drew his pistol, placed it in close proximity to the head of deceased, and fired upon and killed him. The defense set up by appellant went merely to the degree of the homicide; that is, he claimed that he killed deceased because of the insulting words and conduct towards his wife, after their marriage, which was intensified by an alleged rape upon

her by the deceased prior to their marriage; and that he killed deceased on their first meeting after being informed thereof. The defendant having been previously acquitted of murder in the first degree, the only issue presented on this trial was whether or not he was guilty of murder in the second degree or of manslaughter.

1. Appellant introduced his wife as a witness, who testified as to the alleged rape, which she testified was committed upon her in the year 1871, prior to her marriage with the defendant, which occurred in March, 1874. In that connection she stated: That she was living with a Mrs. Cockrell, in Dallas. That she occupied a room upstairs, with her infant child, by a former marriage. That Veal came and stayed all night at Mrs. Cockrell's, he being then a minister of the gospel in the Methodist Church, and was assigned a room upstairs, in which he slept. That some time during the night she was aroused from slumber, and saw standing by her bed a man. She raised up, and told him to go away. "He kept standing there, and when I said that, he put his hand out to mine, and put his hand over my mouth, and he says, 'Hush; they'll hear you.' I was almost paralyzed with fright, but I seemed to realize what his object was, and threw myself backward, and threw my arms around my baby, but he pulled me away and ravished me. I was not conscious at the time I was outraged. When consciousness returned to me, Veal had gone." She further testified: That "about a year after her marriage with defendant, while she was living on Ross Avenue, in Dallas, one day some one knocked at the door and the servant came and opened it, and Captain Veal, the deceased, came in. That Veal, instead of going into the parlor, came into the room where she was sitting. That she got up, and he came toward her, with his arms out, just like he was going to take her in his arms; and that she stepped back and said: 'You forget yourself, Captain Veal. You forget that I have a husband to protect me now.'" She told him to go away, and turned and left the room. "A number of years after that, while I was living in East Dallas, near the ice factory, and after I had moved in from Mesquite, my little girl came and said, 'There is a gentleman at the door.' I looked, and saw Captain Veal standing in the front door. I said: 'What do you mean, Captain Veal, by coming to my house? You know I do not want to see you. It makes me miserable to see you; and I don't want to see you.' And he said, 'I was taking a walk, and thought I would stop in and see you a few minutes.' And I told him he was not welcome, and did not want him to come near me. He only stayed a few minutes, and then left. These were the only two occasions I ever saw Veal after I was married to Dr. Jones." She testified: That in the fall of 1891, for the first time, she mentioned Veal's conduct towards her, both before and since her marriage with the defendant. That when she told her husband of these matters he became greatly excited, and acted like a crazy man. He wanted to go immediately to Fort Worth (where Veal then lived), but she begged him not to, and to let Veal alone. That repeatedly thereafter the subject was mentioned, the defendant bringing it up, and on such occasions

he would act like a crazy man. This is the condensed testimony of Mrs. Jones introduced by the defendant. Over the objections of the defendant, the State proved by Mrs. Jones that she had conveyed certain property to her son, James Bullington, at the instance of Mrs. Cockrell and Mitch Gray, upon the eve of her marriage to the defendant; that this angered the defendant, and he also became angry at Mitch Gray and Mrs. Cockrell because of this matter; that the defendant forbade his wife visiting Mrs. Cockrell for nearly twenty years on account thereof; the squandering of the witness' property by the defendant; the effort of the witness, Mrs. Jones, and the defendant to have the disabilities of minority of James Bullington removed, in order to have him reconvey the property to witness; and also interrogated the defendant's wife as to advice given by the deceased to her in reference to her property, and that deceased transacted business for witness and defendant. These matters were all brought out upon what is termed a cross-examination of the witness. Mrs. Jones had testified to no facts to which these matters related or were germane; not one. When the State left the matter elicited upon examination in chief, and attempted to prove these things by Mrs. Jones, it made her its witness, and would have had the right to introduce her as a witness, and prove these facts, if appellant had never placed her upon the stand, if such facts could be proved by her, as was done in this instance. The wife can be a witness for the husband, but not against him. He is permitted to prove by her any fact that he desires. The State had the right to cross-examine her pertaining to the facts sworn to by her on direct examination. This would be a cross-examination. But when the State leaves the matter elicited in the examination in chief, and attempts to prove independent facts by her, it makes her its witness, and a witness against her husband, over his objections. This can not be done. This is no new doctrine in this State, but is settled by a number of cases. See Creamer v. State, 34 Texas, 173; Greenwood v. State, 35 Texas, 587; Hampton v. State, 45 Texas, 154; Washington v. State, 17 Texas Crim. App., 197; Johnson v. State, 28 Texas Crim. App., 17; Bluman v. State, 33 Texas Crim. Rep., 43; Hoover v. State, 35 Texas Crim. Rep., 342. The rule adopted by the courts in our State is illustrated by the right to cross-examine a witness. The cross-examination of an ordinary witness can only be conducted as to such matters as are pertinent to the matters brought out in the examination in chief; and in most jurisdictions in our country, where a party seeks on cross-examination to bring out matters not germane or pertinent to the examination in chief, if they are legitimate in evidence as competent testimony for the party seeking to bring them out on cross-examination, he will not be permitted to do so in the cross-examination of such witness, but when he comes to present his case he can introduce the witness on his own behalf. See the rule stated in 1 Greenl. on Ev., sec. 445, and authorities there cited. This practice renders patent the fact that the witness, so far as the matters which do not pertain to the examination in chief are concerned, is the witness of the party introducing them. Now, in some juris-

dictions the party is not required to stand the witness aside until he introduces his evidence, but may prove any pertinent fact by the witness introduced by the other party; but in doing so, if he departs from the matter elicited in chief, he makes the witness his own witness. So, applying either rule, the conclusion is inevitable that when the matter elicited in chief is departed from, or when the facts sought to be established upon a cross-examination, so called, are not pertinent or germane to that elicited in chief, the witness becomes the witness of the party attempting to prove such matter. Apply that rule to this case: The facts proved by Mrs. Jones, over the objection of the defendant, as above stated, had no relation whatever, were not pertinent or germane, to any fact elicited on her examination in chief. In a case it may be important as to when the defendant married. He introduces his wife, and proves the date of the marriage. If the rule be otherwise than that stated by us, the State would be permitted to prove by the wife all manner and every description of criminative facts against the husband. We are of opinion that the State had a right to prove by Mrs. Jones, because it was pertinent to her examination in chief, that she visited the deceased after the commission of the alleged rape and the other insulting conduct. Any fact or circumstance which tended to show a friendly relation between Veal and Mrs. Jones after the insulting conduct above mentioned occurred is admissible, because pertinent to her examination in chief; but nothing else, according to this record, was permissible to be shown by the State on cross-examination. Now, while the court might have violated this rule in permitting the State to prove facts not germane to the examination in chief, yet, unless the facts are of such a character as to have a material bearing upon the issues involved, we would not reverse this judgment upon this ground. The question, therefore, is the materiality of these facts; their bearing, etc., when viewed with reference to the theories of both parties. The record develops the fact that the theory of the State was that Jones killed the deceased because he was trying to protect Mrs. Jones, and especially her son, James Bullington, from the avarice of Jones, the defendant; that Veal was the protector of Mrs. Jones and her son, and that he was a serious obstacle in the way of Jones in his (Jones') desire to obtain the possession and control of the property which belonged to Bullington, having been transferred to him just before the marriage of the mother with the defendant; his object was to get a deed from young Bullington to his wife for the property and real estate, and finally to have the control and management, and perhaps the absolute fee to the property, in himself, and that the deceased was an obstacle in the way of defendant to perfect his plans. The theory of the defendant was that, owing to the insults, outrages, and conduct of Veal towards his wife, he killed him, and that he was, therefore, guilty of nothing greater than manslaughter. These were the opposing theories. The battle was fought upon these lines; the State marshaling all the facts and circumstances in support of its theory, and the defendant all that supported his theory. Now, the State is permitted, over the objec-

tions of the defendant, to lay the very foundation upon which this theory rests by the testimony of Mrs. Jones, which was not germane to anything elicited by the defendant. We think the testimony was very important when we look to the issues between the parties, and, not being pertinent or germane to her examination in chief, but being original testimony, she being the wife of the appellant, its admission, over the objection of appellant, was improper.

2. On the trial of the case, appellant introduced one T. G. T. Kendall, and proposed to prove by him that immediately after the communication made by the wife of appellant to him in the fall of 1891 (about a year prior to the homicide) in regard to Veal's conduct toward her, that defendant, being in great distress of mind, sought his friend, said Kendall, to advise with him relative to the communication so made by his wife; that defendant was then in an excited and distressed condition of mind, and then and there told Kendall of said communication so made to him by his wife, to wit, that Veal had raped her in 1872, prior to her marriage with defendant, and after her marriage with defendant, in 1874 or 1875, and again in 1885, Veal had visited her with lecherous and carnal propositions, and that in said first visit Veal had sought to embrace his (defendant's) wife; defendant stating then and there to said Kendall that his (defendant's) wife had communicated such facts to him a few days prior thereto. Defendant further offered to prove that he expressed to Kendall his unqualified belief in the truth of the statement so made to him by his wife; that said Kendall then stated to defendant that he did not believe it, that he had known defendant's wife since she was a child, and that he would not believe that Veal or any other man had raped or insulted her, unless he heard it from her own lips; and said Kendall refused to talk with defendant, and left him. He also offered to prove by Kendall that shortly thereafter he saw Mrs. Jones (wife of appellant), and that she told him of the circumstance of Veal having raped her before her marriage with appellant, and of his subsequent visits to her as stated above. A few hours after this, Kendall again met defendant, and told him: "I have been to your house. I have seen and talked with your wife, and she has told me that what you stated to me in regard to Veal's conduct toward her was true." And said witness, in that connection, stated to appellant: "Every word your wife has stated to me and to you is true. Veal did everything she says he did. I know your wife to be incapable of telling a lie. A purer, better woman never lived, and I believe every word she says about it." Appellant also offered to prove by Kendall that repeatedly after said communications appellant talked with him about said matters up to within a few days of the homicide, and on all such occasions he was greatly excited, and appeared to be in a distressed condition of mind, and on such occasions was never calm, and always avowed his belief in the truth of said communications made to him by his wife. Appellant also proposed to prove by his wife that she made the statement to Kendall as above stated; and it was also proposed to prove by her that she told Mrs. Cockrell these same matters. All of

this testimony was objected to by the State, and excluded by the court, to which defendant excepted. Appellant insists that said testimony was admissible as tending to show that his defense set up in this case was not fabricated, and as tending to rebut the contention of the State that said matters were manufactured after the homicide. He also urges that said testimony was admissible as tending to establish both the truth of the facts communicated to defendant by his wife, and the defendant's belief in the truth of said communication; and also showed a communication to defendant by Kendall of the same facts communicated to the defendant by his wife, and that defendant's wife, long anterior to the homicide, had communicated said rape and subsequent insults by Veal to another than the defendant.

The statement of acts presents but one issue, and that is, whether appellant was guilty of murder in killing W. G. Veal, or whether he was guilty of manslaughter. If the jury believed the testimony of Mrs. Jones and appellant, the theory of appellant that it was nothing greater than manslaughter is clearly presented. If the jury did not believe the testimony of appellant and Mrs. Jones, then manslaughter, so far as the jury is concerned, is not in the case. The State's theory is that the killing was not prompted by a passion aroused by this misconduct of Veal towards Mrs. Jones (wife of appellant), and that her testimony was manufactured to aid her husband in his defense. Every particle of testimony introduced by the State is for the purpose of making a case in opposition to the truth of the testimony of Mrs. Jones and defendant. Now, the rule of law is that, where the opposing case is that the witness testified under corrupt motives, or where the impeaching evidence goes to charge the witness with a recent fabrication of his testimony, the party introducing the witness can prove that before the motive existed (the motive in this case being to save the life or liberty of her husband), the witness made the same statement as that sworn to. To state the proposition in another form: if the opposing case is to the effect that the witness had a corrupt motive in swearing to certain facts, or that the witness recently fabricated the testimony for a purpose (in this case the motive being to prevent the conviction of appellant, and that, therefore, this testimony was manufactured after the death of Veal), the party introducing the witness (being the appellant in this case) can show that before the deceased (Veal) was killed the witness (Mrs. Jones) told the same story which she swears to upon the trial. By such proof, the charge that it was fabricated, or prompted by an improper motive, is completely met and destroyed, if believed by the jury. The authorities are divided as to whether a witness can be supported because the adversary has shown that he made conflicting statements about the fact. We hold that this can be done. This, however, is a doubtful question when tested by the authorities. All the authorities agree, where the attack is made that the witness is prompted by improper motives, or has recently fabricated the story, that under either of these contingencies the party introducing his witness can prove his witness stated the same facts prior to

the time when the motive could have existed, or prior to the occasion or circumstance prompting the manufacturing of the testimony. We have repeatedly written upon this subject, laying down substantially the same rules that we here state, and we deem it unnecessary to even cite the cases. In support of this last proposition we cite 1 Whart. on Ev., 2 ed., art. 570. We also call attention to the long list of cases cited by Mr. Wharton in note 2 to this article. Apply these principles to this case: When the testimony in the case had been concluded there was no evidence before the jury that Mrs. Jones or appellant had ever alluded to the outrages committed upon Mrs. Jones. The inference was cogent, indeed, that it was fabricated to save the life or liberty of the appellant. When the testimony of Mrs. Jones is scrutinized, it is placed in a very doubtful attitude. It would have been perfectly natural and reasonable for the jury to have inferred that she had manufactured her testimony because she wanted to save her husband. But suppose, in addition to her testimony (it being of a doubtful character standing alone), the evidence of Kendall had been received, would any man have entertained the same doubts about its truth as if her testimony had been without support? Law should be common sense, and there is no man but what would have much more readily believed her testimony if they had known that she told the same story before the death of Veal as that which she swears to on the trial. We are of opinion that this testimony was admissible for the purpose of supporting Mrs. Jones, and for the purpose of showing that Jones believed her statements. Again, in another view, this testimony was admissible as independent evidence, for the purpose of showing that the insulting conduct of Veal towards Mrs. Jones had been communicated to Jones prior to the homicide. It is true that Mrs. Jones swore directly that she communicated the insulting conduct of Veal to her husband, but the defendant was not circumscribed by making such proof by his wife. As original testimony, it was entirely competent for the defendant to have introduced Kendall to show that Mrs. Jones communicated the conduct of Veal to him, and that he in turn told it to the defendant prior to the homicide.

3. The next question presented is whether or not appellant had the right to prove the general reputation of deceased with reference to his being a man of chaste and virtuous habits and conduct towards women or otherwise. Appellant attempted to do this by a number of witnesses, and on objection by the State it was excluded by the court. We are of opinion that specific acts of lewdness (which appellant also claims were excluded) were not admissible. The general principle applicable to such specific acts is that it would involve too many issues, and the court can not turn aside to try a vast number of collateral matters. But the rule is different as to general reputation. We are of opinion that proof of deceased's general reputation being bad in this particular was not admissible for the purpose of showing that he was guilty of the insulting conduct towards Mrs. Jones, but we are of the opinion that his general

reputation was admissible for the purpose of determining whether Jones believed the story told him by his wife. We have no doubt of the correctness of this proposition. In addition to this, appellant had a right to prove that his general reputation was bad, and that he was informed of such reputation. This evidence is admissible, as before stated, to show that he not only believed what his wife had told him, but added greater probability to the presumption that he acted on this belief.

4. The next question presented is as to the action of the court in admitting the testimony of S. Q. Richardson as to seeing a woman in the office of Veal during the year 1885, and that Veal told witness that it was Mrs. Jones. The object of this testimony on the part of the State was doubtless for the purpose of showing the friendly relation existing between Mrs. Jones and Veal, and so to discredit her story with reference to Veal's insults towards her. Now, if this testimony had identified the Mrs. Jones seen in Veal's office by Richardson as the wife of appellant, or if it had a tendency to so identify her, it would have been admissible. But, in our opinion, there was no circumstance connected with this matter that sufficiently identifies her as being the wife of appellant, and so the testimony should have been excluded. Again, what Veal said about it was clearly hearsay evidence, in the absence of any testimony tending to identify Mrs. Jones there mentioned as the wife of the appellant. This testimony, as presented, is purely hearsay. If, in fact, Mrs. Jones visited Veal, as attempted to be shown by Richardson, this would have been a very strong circumstance with the jury, tending to negative or disprove everything that she had said about the insulting conduct of the deceased. The conclusion would have been very strong, indeed, that she had manufactured this story for the purpose of saving the life and liberty of her husband. Now, the rule is that no conclusion can rise higher than the facts from which it is made. When a conclusion is sought to be made, the fact upon which it is based must be clearly proved. Vague suspicions, leading to hurtful conclusions, are not permitted in law. See Burrill on Circ. Ev., p. 126. This is the second appeal of this case, appellant having previously been convicted of murder in the first degree, but the case was reversed, because it was not properly tried. 33 Texas Crim. Rep., 492. The questions discussed in this opinion are upon the admission and exclusion of evidence, which, in our opinion, go to the merits of the case. The errors are not mere irregularities, but are in regard to the admission and exclusion of evidence upon vital questions, and it is impossible for us to tell what influence the excluded testimony might have had upon the jury, or what influence the admitted testimony may have wrought upon their minds. The rules with regard to said testimony, it occurs to us, are obvious. They are found in the text-books on evidence, and have been followed by this court in a number of decisions. We can not afford to set a bad precedent by their violations, nor are we inclined to do so. In the discharge of our duty, the rules of evidence must be observed in all cases. This is for the common benefit of all, in order that all may alike be protected by the rules of law. Because, in our

opinion, these rules were not adhered to and enforced in the court below, the judgment is reversed, and the cause remanded.

*Reversed and remanded.*

After the above opinion was handed down, the following motion for rehearing and brief in behalf of the State was filed by Hon. Mann Trice, Assistant Attorney-General:

Now comes the State by attorney, and moves the court to set aside its judgment of reversal rendered herein on May 19, 1897, and grant a rehearing for the reasons following, to wit:

1. Because the court erred in holding that the trial court should not have permitted the line of cross-examination of the wife of appellant as disclosed by bill of exceptions number 3, in this: The matters inquired about by the State on cross-examination of the wife of Jones were germane to the matters elicited from said witness on her examination in chief. Mrs. Jones having testified to exculpatory facts on the examination in chief, to wit: That Jones had been a warm friend of Veal up to the time she communicated to him the story of the remarkable rape, and endeavored by every means possible to demonstrate to the jury that the killing was the result of the alleged insults to her and was due to no other cause. The theory of the State was that Jones had been at enmity with Veal for many years antedating the time she claims to have related to him the outrages of Veal upon her, and that this enmity was due to the supposed interference of Veal in preventing James Bullington from reconveying the property Mrs. Jones had conveyed to Bullington the evening prior to her marriage with Jones. It was therefore permissible for the State on cross-examination to ask Mrs. Jones any question tending to contradict her testimony in reference to when Jones became enraged at Veal and as to the cause of his anger. Especially would this be permissible for the purpose of laying the predicate to impeach Mrs. Jones, by showing that the killing was not the result of the alleged rape, but due to other causes. I concede that the general rule is as stated by the court, that the cross-examination of the wife should be confined to the matters drawn out on the examination in chief, or be germane thereto, but there are well established exceptions to this general rule, which is universal and binding; that is, the right of cross-examination extends to all matters connected with the res gestae and as to credit. Whart. on Ev., sec. 529; Wallace v. Wallace, 62 Iowa, 651; Wroe v. State, 20 Ohio St., 460; Mask v. State, 32 Miss., 405; State v. Sayers, 58 Mo., 585.

Again, it is well settled that as a general rule a witness can not be cross-examined as to collateral matters. It is equally well settled, that if the testimony goes to show the bias of the witness or falsity of the main story, it is permissible to cross-examine as to collateral issues, and issues not touched upon in the examination in chief. Whart. on Ev., sec. 532; U. S. v. Hudland, 5 Cranch C. C., 309; Com. v. Shaw, 4 Cush., 593.

Mrs. Jones studiously avoided answering in the affirmative any questions tending to show that Jones was angry with Veal, because of her

conveyance of her property to her son and her son's refusal to reconvey to her. On the contrary there was a labored effort upon her part to show that no enmity was engendered by reason of these things. To hold that she could not be asked questions for the purpose of laying a predicate to impeach her on this line, would be tantamount to a denial of the right of cross-examination, which I apprehend would not be tolerated.

The cases of Creamer v. State, 34 Texas, 173, and Greenwood v. State, 35 Texas, 587, cited by the court to sustain its position in this regard, are decisions of the old "Semi-Colon Court," and are very rarely ever relied upon as authority in this State. And in so far as said cases hold that the cross-examination should be confined to the matters drawn out of the examination in chief, same is at variance with the opinions of the Supreme Court of to-day and of the former opinions of this court. Rhine v. Blake & Jenkins, 59 Texas, 240; Morris v. State, 30 Texas Crim. App., 116; Brookin v. State, 26 Texas Crim. App., 121; Johnson v. State, 27 Texas Crim. App., 163; Miller v. State, 28 Texas Crim. App., 445; Id., 448.

2. This court erred in holding that the trial court should have permitted Mrs. Jones to be corroborated by her unsworn statements made to Kendall, in reference to the alleged rape, for this: The State did not seek to impeach her by showing contradictory and different statements made by her. The fact that the State did not admit the truth of her story can not be termed an impeachment. It is never admissible to sustain a witness by proof of general good character or otherwise, until the reputation of the witness is assailed for truth and veracity or impeached by showing contradictory statements. These are conditions precedent to offering testimony to corroborate or sustain a witness. "Assaults upon the veracity of a witness, made only by counsel in argument, do not constitute such an impeachment of the credibility of the witness as will authorize the admission of testimony to sustain his reputation for truth and veracity." Ricks v. State, 19 Texas Crim. App., 308. See Railway v. Raney, 86 Texas, 363.

The court cites article 570, eighth edition of Wharton's Evidence, in support of its theory that Mrs. Jones should have been corroborated by her unsworn statements. If the court will examine the ninth edition of Mr. Wharton's Evidence, under article 570, on this subject, the following will be found: "We find the decided weight of the authority to be that proof of declaration made by a witness out of court, in corroboration of testimony given by him on the trial of the cause, is as a general rule inadmissible, even after the witness has been impeached or discredited; and we are satisfied with the correctness of the rule." The following authorities are cited: 2 Phillips on Ev., 5 ed., 973; 1 Starkie on Ev., 147; 1 Greenl. on Ev., 469; Robb v. Hackley, 23 Wend., 50; Gibbs v. Linsley, 13 Vern., 208; Ellicott v. Pearl, 10 Pet., 412; Conrad v. Griffith, 11 How., 480.

To say that a witness can be corroborated and probative force given to testimony by introducing the unsworn statements of the witness, it seems to me is a dangerous proposition. If A charges B with the commission of an offense, and B pleads not guilty; A takes the stand and swears to a state of facts that if true would make out the offense, and B denies the charges, it seems strange to say that it would be permissible to corroborate A by showing that he had made the same statement to divers other persons before the proceedings were instituted. Now, if the other persons were called in, they could only testify that A had made the same statements to them that he had testified to under oath. They could not testify to the truth of the story, nor should it be permitted to bolster up a witness in this way. If this were true, "a witness's credibility would depend more upon the number of times he had repeated the same story than upon the truth of the story itself." Bailey v. State, 9 Texas Crim. App., 99, 100; Whart. on Ev., 511.

Again, "that the same statements were made at another and different times, furnished no evidence of its truth, and unsworn statements of doubtful credibility should not be permitted to corroborate the sworn statements, especially if the witness has not been impeached by showing contradictory statements, or that her reputation was bad." Sidelinger v. Bucklin, 64 Me., 371.

The rule as stated by Mr. Jones is as follows: "The rule has sometimes been declared, that after an attempt has been made to impeach a witness by showing his contradictory statements, proof may be received that he had affirmed the same thing before on another occasion, and that he is still consistent with himself. But it is clear that this view is contrary to the great weight of authority. A representation without oath can scarcely be considered as any confirmation of a statement upon oath." Jones on Ev., sec. 872. See also State v. Archer, 73 Iowa, 320; Tussell v. State, 93 Ga., 450; State v. Thomas, 3 Strob., 269; Connor v. People, 18 Col., 373; Munson v. Hastings, 12 Vt., 346; 36 Am. Dec., 345; Bailey v. State, 9 Texas Crim. App., 100.

It is but natural that the State should have disputed the truth of the story of an alleged rape, made in a house with a number of other occupants, and where no force, threats, or fraud were resorted to, and where no outcry or disturbance was made for more than twenty years, and when the rape was accomplished in such an easy and noiseless manner as not even to awaken the baby sleeping in the same bed. This is not a story calculated to be believed by every person. In fact, rapes of this character should not, in my judgment, receive judicial encouragement. Because forsooth a citizen would be so incredulous as not to believe this story, this could not be termed such an impeachment of the witness as to permit unsworn statements to sustain her.

3. The court erred in holding that it was permissible to prove the general reputation of deceased as being a man of chaste and virtuous habits. His reputation in this regard could not avail defendant on this trial for murder.

4. In view of the facts in this case, it was not reversible error to permit S. Q. Richardson to testify that he saw a woman in Veal's office, and that Veal stated it was Mrs. Jones. She was identified by other witnesses as being the identical Mrs. Jones who testified in this case, and as having been seen in Veal's office and in company with Veal at other places, and she did not exhibit any signs of disagreeable emotions of the mind when seen in his presence, as indicated in her testimony.

*R. B. Seay, J. C. Muse, S. H. Russell,* and *Miller & Williams,* in opposition to the motion.—This case was reversed upon this appeal by this honorable court, upon the consideration of the four following issues, presented in the record, viz.:

"1. The action of the court in permitting a cross-examination of Mrs. Jones upon matters, as insisted upon by appellant, not drawn out from her on the examination in chief, and not pertinent to such examination.

"2. The action of the court in refusing to permit the appellant to prove by the witness Kendall what defendant and his wife may have told him with reference to the alleged insults of the deceased toward her.

"3. The general reputation of the deceased, with reference to his being a man of chaste and virtuous habits and conduct towards women or otherwise.

"The admission of the testimony of S. Q. Richardson, to seeing a woman in the office of Veal during the year 1885, and that Veal told Richardson that it was Mrs. Jones," etc.

The decision of the court upon the questions of evidence is in conformity with the statutes of the State precluding the husband or wife from being used as a witness against each other, and with the uniform trend of decisions in this State.

This answer is deemed unnecessary, but it is deemed proper to challenge the unique and startling propositions seriously asserted for the State in the motion for rehearing, assailing the opinion of the court upon the four issues above stated.

1. The Assistant Attorney-General concedes, "that the general rule is as stated by the court, that the cross-examination of the wife should be confined to matters drawn out on the examination in chief," but insists that "the right of cross-examination extends to all matters connected with the res gestae, and as to credit." It is likewise tacitly conceded that the so-called cross-examination of Mrs. Jones, by the State, was not confined to, but went beyond the matters drawn out upon her direct examination; which was confined to and elicited only the fact of Veal's assaults and insults prior and subsequent to her marriage with the defendant, her communication thereof to him in the fall of 1891, and the effect of such communication upon him. And it will be seen that her testimony by the defendant was confined within the statutory limitations of manslaughter. The defendant having introduced his wife as a witness in his behalf, could safely rely on the statute; that as a witness her testimony for or against him could go no further than elicited by him, and

that her cross-examination should be confined to the matters drawn out by him. Right or wrong, it is the law. What was drawn out on the so-called cross-examination of the wife? The fact of her conveyance of property to her son James Bullington, at the instance of Mrs. Cockrell and Mitch Gray, just prior to her marriage with defendant; his enmity for nearly twenty years towards such parties, Gray and Cockrell, therefor; the dissipation of the wife's property by the husband sought to be shown; that the husband managed it and that it was all gone, proven. The effort to have the disability of James Bullington removed, and have him reconvey the property to his mother; and the fact that the deceased had transacted business for the defendant and his wife; and other matters of similar import were elicited from the wife by the State, over objection of the defendant. Now, by what legerdemain of specious logic can this testimony be held germane to the facts of insult to the wife, communication thereof to the husband, and his excitement and passion thereat?

The position of the State is that no outrage or insult to the wife occurred, hence no communication thereof or passion thereat could exist, and that the statement of the wife upon direct examination was untrue. Now, this is the theory of the State, and it contends that the defendant killed the deceased on account of a property motive, viz., that Veal was advising against and preventing the reconveyance of the property by James Bullington, which had been conveyed to him by his mother prior to her marriage with the defendant. The State had the right to prove the facts that would show its theory to be true, if it was true, but not by the wife. If it had been a case of deliberate murder, and if the defendant had not introduced his wife as a witness, the State could not. The husband having introduced her, what are the limitations as imposed by law as to her examination as a witness? The court has correctly stated them, following an unbroken line of decisions in this State, and the plain mandate of the statute. Even the Assistant Attorney-General concedes this, but claims that the case is an exception to the general rule. Upon what ground? Surely not upon the assumption that the facts elicited by the State upon cross-examination of the wife were germane to her direct examination. The facts elicited by the State were independent, and wholly disconnected from the facts drawn out by the defendant from his wife. Cross-examination is the examination of a witness upon the matters already elicited. To go beyond this is to make the witness your own.

The Assistant Attorney-General insists that the exception to the rule, which would permit the cross-examination of the wife to be enlarged beyond the matters drawn on direct examination, "extends to all matters connected with the res gestae and as to credit."

The statute has made the rule followed by the court, and to adopt the views presented for the State would be to overrule the statute, and embark upon a sea of judicial legislation, with a shifting, uncertain compass, furnished by the words in the rule invoked by the State, viz., cross-examination, res gestae, credit. But taking this compass for guidance in this case, where would we land under logical construction? First, we

must know to start with, what is cross-examination. It is what the words imply, an examination or inquiry into the facts already stated by the witness; when it goes beyond this it ceases to be a cross-examination, and becomes a direct examination; and it has been decided by this court that the witness then becomes the witness of the party conducting such direct examination. Tested by this rule, the facts elicited by the State from the wife was not cross-examination, and the State occupies the position of introducing the wife as a witness against her husband.

Again, what res gestae fact has the State been precluded from proving by the wife, under the contention that the cross-examination of the wife could include "res gestae?" What is res gestae? The thing done, the facts immediately connected with the thing done. What is the thing done in this case? The indictment says murder. The wife was not present at the killing. She was not interrogated about it. The facts elicited from her form no part of the res gestae. But perhaps it was the idea of the State to "stretch" the terms res gestae to include everything connected with the facts of the outrage and insults to the wife, communications to the husband, and passion thereat. If so, the cross-examination of the State upon this matter was without objection and no error is assigned thereon. But in what way the facts drawn out by the State upon its alleged cross-examination could form part of the res gestae of the outrage and insults to wife, is undiscoverable. Res gestae is an elastic legal term, and has its legitimate bearing in a proper connection, but it can not be stretched so as to obliterate a plain statute. The right of the wife to testify at all is limited by law, and her cross-examination can not be extended upon the issue as to the credit of her statements, beyond matters pertinent to the testimony adduced on her direct examination. This the court has recognized, and pushed the doctrine to its fullest extent in behalf of the State, in holding that the State might interrogate the wife as to visiting Veal as a matter pertinent to the facts stated by her in direct examination. The court in its opinion correctly states it is no new doctrine in this State that the cross-examination of the wife must be germane and pertinent to the facts drawn out on the direct examination, and cites a number of authorities sustaining that position, among the number the Creamer and Greenwood cases. Counsel for the State in the motion for rehearing refers disparagingly to these two cases as rendered by the "Semi-Colon Court," and that the same are rarely relied upon as authority, and indulges in the criticism that the opinion in this case upon this point as at variance with the opinions of the Supreme Court and the former opinions of this court, and cites Rhine v. Blake & Jenkins, 59 Texas, 240, a civil case, and four criminal cases. Counsel ignores or overlooked the distinction between a civil and a criminal case. In a civil case, confidential communications between a husband and wife are protected. In a criminal case, neither shall be a witness against the other, and when introduced as a witness by one for the other the cross-examination is limited, as decided in this case. Such is and has been the settled law of this State and was followed by the "Semi-Colon Court,"

also uniformly by this court. And the authorities cited by the State do not support the contention made. The theory of the State was that the motive for the killing was a property motive. The record discloses that more than a year before the killing James Bullington had become of age, and reconveyed to his mother the property which she had deeded to him, before her marriage with the defendant, when he was an infant. And this fact was in answer to the theory of the State as to the existence of a property motive, and emphasizes the injury to the defendant in the admission of the illegal testimony elicited from his wife.

2. The court holds that the rejection of Kendall's testimony relating to the communication by Mrs. Jones to him of the same facts communicated to the defendant, and Kendall's subsequent communications of the same to the defendant, prior to the homicide, was error, upon two grounds: (1) that the same was competent as original evidence upon the issues of the fact of the communication being made to the defendant, and his belief in the truth of the story; (2) that it was competent as tending to rebut the theory of the State that the story was fabricated by the defendant after the homicide, by the defendant and his wife. The Assistant Attorney-General attacks only the latter proposition; his silence upon the former proposition may be legitimately construed into acquiescence as to its correctness. To dispute it would argue great unfamiliarity with the rudiments of elementary law and challenge the derision of common sense. I say again, the silence of the State upon this proposition is significant. It is a concession as to the correctness of the opinion reversing this case. Let me illustrate: The State in a murder case proves by one witness facts which, if believed, would constitute cold-blooded, deliberate murder, and justify and merit the infliction of the death penalty as a punishment to the defendant. The State then offers to prove by other witnesses the same facts to strengthen its case; the defendant objects to further testimony, because but one witness can prove the same facts. Would an intelligent court give the proposition serious consideration? The proposition would excite ridicule in the common sense of the country. Again, a defendant in a murder case, relying upon self-defense, offers to prove by more than one witness the acts done in self-defense, and that his life had been threatened by the deceased. The State objects, and insists that the proof of the same fact shall be limited to one witness. Such a rule would be scouted by the business sense of the country, where only dollars and cents are involved, upon contract or otherwise. Is the rule to be more liberal where dollars and cents are involved than where life and liberty is at stake? Now, applying the illustrations to this case, the defendant proves by his wife the communications to him of her story of outrage and assault and insult, and offers to prove by Kendall that the wife also told him, and that he made the same communication to defendant, before the homicide. No rule of law would reject this testimony. Why? Because communication and belief are the pivotal facts in the defense, and their proof can not be restricted to the testimony of one witness. As well say that if A inform B that assault

and outrage has befallen his wife, and B is likewise so informed by his wife, that the testimony of the wife will be rejected because A first communicated it to B, and a fact can be proven only by one witness. So much I have said on the proposition to demonstrate the weakness of the motion, and that from the State's standpoint the decision is correct.

But the Assistant Attorney-General attacks the second proposition, and says that the court erroneously held that Kendall's testimony was not admissible to support the testimony of Mrs. Jones, who was sought to be impeached by the State. He illustrates by saying that suppose A swears to facts that constitute B guilty. B denies and proves that he made the same denial before prosecution. Then says that it is ridiculous that he could corroborate himself by such statements. We say so, too. The court in this case decided no such nonsense. And we doubt if it was ever so held by any appellate court. In the first place, an affirmation on the one side and a denial on the other is not an impeachment. It has been repeatedly so held by this court. In the second place, the statements of a defendant made after the commission of an offense, even though made before prosecution, are held to be self-serving and inadmissible in his behalf. But how is the rule when the statement of the witness was made before the commission of the offense, before any motive for fabrication could exist. The weight of reason and authority support the court in the decision that such statements may be introduced to support the witness when attacked or impeached. The Supreme Court of of the State so held in the Marek civil case cited in appellant's brief. And the decision of this court on that point is in accord with its previous decisions. Again, applying the illustration made in this case by us. The State limits the evidence of the defendant to the testimony of himself and wife, upon the issue of the insults, etc., to the wife, and their communication to the husband and defendant. The State then, after so circumscribing the defendant's evidence, charges them with fabricating the story, after the killing, to escape a murder conviction. And after so attacking them, declines to permit proof by Kendall that the wife told him, and that he communicated it to the defendant, more than a year prior to the killing. Common justice and fairness could not exclude this testimony.

Again, the second proposition is absorbed in the first. If Kendall's testimony was admissible as original evidence to show communication, etc., the testimony as original evidence would have been admissible for all purposes, and it does and would have supported Mrs. Jones, upon the theory that it was not fabricated after the killing, and that the communication was made to the defendant before the homicide. The position of the Assistant Attorney-General goes to the weight of the testimony, and not its admissibility. He says that the story is not calculated to be believed. Suppose not; that is not a question which concerns him or this court; the issue now is as to its admissibility; its weight and credence is for the jury. Tested by this rule, the statements of the defendant and

38 Texas Crim. App.—8

his wife should have been rejected, according to the argument, because not calculated to be believed. But the Assistant Attorney-General puts himself in this anomalous position; he concedes Kendall's testimony admissible as original testimony, by his silence as to that proposition, but says that it was not admissible to support Mrs. Jones, when in fact if admissible as original evidence it was admissible for all purposes, including support of Mrs. Jones. Then he reaches the climax of illogical inconsistency by assuming that the story of the defendant and his wife is incredible and was fabricated after the homicide, and gravely says that Kendall's testimony should not be received, which would disprove the charge of fabrication. But he leaves the proposition with the suggestion, that rapes of this character should not receive judicial encouragement. Counsel has evidently overlooked the habeas corpus opinion in this case. He possibly forgot for the moment, when he penned the sentence, with such unkind inference, that this court is not a nisi prius court, but only an appellate court, whose legal and constitutional duty it was to point out and correct the errors of law committed upon the trial.

3. The third proposition in the motion avers that the court erroneously holds that the reputation of Veal was competent evidence, and affirms that such reputation could not avail defendant on this trial for murder. The motion contents itself with this brief ipse dixit.

The statute provides that homicide is divided into murder of the first and second degree and manslaughter. It avails a defendant much as to which he is convicted of. The statute provides and the decisions hold, in self-defense to homicide, that the belief of the defendant as to the peril under which he acted is the pivotal issue in self-defense. Evidence as to threats by the deceased, habit of carrying arms, reputation as a dangerous man, etc., is admissible evidence. What for, unless it be to shed light on the belief under which defendant acted? Now, in manslaughter predicated on insults, etc., to wife or female relatives, belief in the truth of the communications as to the insults, etc., is the pivotal issue in reducing murder to manslaughter. Then what? The conclusion follows, as does night the day, that belief in manslaughter is the corrollary of belief in self-defense. As is said by the court, the reputation of Veal was not competent to show that he was guilty of the insulting conduct charged, but it was admissible as tending to shed light as to the defendant's belief in the truth of the communications made as to such insulting conduct.

4. The Assistant Attorney-General urges that the court erred in holding that S. Q. Richardson's testimony was inadmissible, to the effect that he saw a woman in Veal's office, and that Veal told him that it was Mrs. Jones. Then follows the statement in the motion, she was identified by other witnesses as being the identical Mrs. Jones who testified in this case. If this was true there would be merit in the proposition. But what is the fact? The record discloses that no witness identified or attempted to identify the woman, who Richardson says Veal told him was Mrs. Jones, as being the wife of the defendant. On the contrary, the

record shows that there were then in Dallas several Mrs. Dr. Jones. Richardson's testimony was hearsay, and there is nothing to show that the woman in question was the defendant's wife. The name is not so rare in Texas as to suggest any particular individual.

5. The appellant submits the case and asks that the motion for rehearing be denied.

### ON THE STATE'S MOTION FOR REHEARING.

DAVIDSON, JUDGE.—We have carefully considered the motion for rehearing presented by the Assistant Attorney-General. At a former day of this term this court reversed the judgment of the lower court on four errors committed. We will go over the grounds again, and re-examine the record.

1. The first error is in relation to the court's permitting the State to prove by Mrs. Jones, wife of appellant, facts and circumstances not germane to anything she had sworn on her testimony in chief. We held, and still hold, that this can not be done. The law will not permit the husband or wife to be a witness against each other. If the husband is upon trial, and his wife is a witness, and she should swear to facts injurious to him, in answer to questions propounded, he could not complain, but, where she swears to certain facts and circumstances, the cross-examination must be confined to the matter elicited in chief. Of course, everything which is legitimate for the purpose of testing her knowledge of the facts sworn to, her bias, her prejudice, in fact any matter that goes legitimately to discredit her, is admissible on cross-examination. However, where the State leaves the matter testified to in chief, and proposes to prove independent criminative facts against the accused, this would not be a cross-examination of the witness. When the matter is departed from, the witness ceases to be a witness for her husband, and becomes a witness for the State. This is absolutely demonstrated by the overwhelming weight of the authority. Mr. Wharton, in his work on Evidence (section 529), says: "Although, in England, counsel, in cross-examination, are permitted to ask questions bearing on the whole case, so as to bring out matters of independent defense, in this country, in most jurisdictions, cross-examinations, with greater propriety, are confined to the subject of the examination in chief, and that of the credit of the witness. If a matter of defense is to be proved, this must be reserved until the cross-examining party has opened his case, when he is at liberty to call the witness to prove such defense." In support of this proposition, Mr. Wharton cites not less than fifty cases, from the States of New Hampshire, New Jersey, Pennsylvania, Michigan, Indiana, Illinois, Iowa, Wisconsin, Minnesota, Kansas, Nevada, Georgia, California, Arkansas, Nebraska, and a number of others. The Supreme Court of the United States holds that, where the matter sworn to in chief is departed from on so-called cross-examination, the witness becomes the witness of the party who elicits this matter. To illustrate the proposition: The defendant

.introduces a witness to prove certain facts. The State cross-examines as to these facts, and then proves independent facts by the witness—facts which are not germane to the examination in chief. So far as these facts are concerned, the witness becomes the witness of the defendant. Now, let us illustrate the question before us: An accused party is upon trial for murder. It becomes relevant and important to know when he and his wife were married, or when a certain child of theirs was born, or whether he was at home at a particular hour of a certain night, etc. He introduces his wife, and she swears to the date of the marriage, to the birth of the child, and that her husband on that particular night was at home. The State can cross-examine her thoroughly as to the marriage, where it occurred, who attended, who were the bridesmaids, grooms, and how old the parties were, etc., and then institute an inquiry as to her prejudice, contradictory statements, if there are such, and every matter which is proper to test her means of knowledge and credibility. So, with reference to the birth of the child, and the supposed alibi. This testimony is elicited from the wife, to wit, the marriage, birth of the child, and proof of the alibi. After having cross-examined the witness pertaining to these matters, the State proposed to prove by the defendant's wife that he had a motive to kill the deceased; that he had threatened to kill deceased; that he had arms suitable for that purpose, corresponding with those used at the homicide, etc. These matters are not relevant at all to the marriage, the birth of the child, or the alibi; and, when the State proves these facts by the wife, she then becomes the witness of the State, and is emphatically forced to testify against her husband. We can not give a clearer illustration of this question than that above. In line with the cases referred to above will be found the case of People v. Briggs, 60 How. Prac., 17. In that case, Osborn, P. J. illustrates a provision of the New York statute which provides that the husband and wife shall not testify against each other, and which might have been inserted for a certain purpose, to wit, he says: "For instance, a wife might be called as a witness on behalf of the husband, to prove some one isolated fact. It may be that the Legislature, by saying that she should not be compelled to testify or give evidence against him, intended to prevent, upon cross-examination, an inquiry into any other matters not inquired into upon the direct examination, and which might be very damaging to the husband, and so vice versa." We deem it unnecessary to add additional authorities upon this subject. In Texas and other States the witness is not required to stand aside until the opposing party introduces his evidence. The adverse party can cross-examine the witness thoroughly pertaining to the matters elicited in chief, and will not be required to wait until he presents his testimony in order to prove facts relevant to the main issue, by the witness. He can prove any competent fact by the witness on what is called cross-examination, but this rule does not affect the question at all. Suppose, upon the so-called cross-examination, the matter elicited in chief is completely departed from, and new matter is sought to be established by the witness, which is relevant to the main

issue, would the party be permitted to lead the witness in regard to this matter? Would he not still, though he could elicit the matter, be held to examine him just as if he had introduced him? Certainly. By way of illustration: The plaintiff introduces a witness, and proves a relevant fact. The adverse party can cross-examine him thoroughly as to this fact. After doing so, if he leaves this matter, and proposes to prove important relevant facts by the witness introduced by the plaintiff, he is not bound to require him to stand aside, but can do so. Should he propose to prove the facts by leading questions, and the plaintiff objects, not to his right to prove the facts, but leading the witness, this tests the question as to whose witness he is as to this matter. Evidently, he is then the witness of the defendant.

The Assistant Attorney-General insists that anything pertaining to the res gestae can be proved by the wife. In his motion for rehearing, he says: "I concede that the general rule is as stated by the court, that the cross-examination of the wife should be confined to the matters drawn out on the examination in chief, or be germane thereto; but there are well established exceptions to this general rule, which is universal and binding—that is, the right of cross-examination extends to all matters connected with the res gestae, and as to credit." Res gestae of what? Res gestae of what she said in chief? If so, we do not object. Does he mean the res gestae of the homicide? If so, we certainly can not concede any such proposition. Mrs. Jones did not say one word about the homicide. She was not a witness to the homicide, and knew nothing of the facts attending the homicide. If res gestae can be established by the wife or husband, upon cross-examination, then the Assistant Attorney-General's exception should be the rule, instead of that stated by him to be the rule, for we have never yet been able to place any limit to what is called res gestae of a homicide. Our understanding of this rule, as explained by Mr. Stephens in his work on Evidence, is that the homicide has its res gestae, or attending circumstances; that any relevant fact to the main fact is its res gestae, until you extend it into a field in which the fact has no probative force. It would be a novel case in which a relevant fact would not be res gestae of the main fact, or which would not have its own res gestae. Now, we concede that anything that is res gestae to what was said is admissible. Mrs. Jones testified as to the rape by Veal, and his subsequent insulting conduct towards her, and that Veal and appellant had been friendly before she communicated these facts to appellant. The State proved by her, over the objections of appellant, all that matter pertaining to the effort to have the disabilities of her son removed, so that he could make a deed to her, etc. We most seriously would ask if this matter was res gestae to the rape or subsequent insulting conduct? Was it calculated to explain, modify, or to affect in any manner her testimony in regard to Veal's conduct? How and in what manner did it bear on the fact that Veal and Jones had been friendly? If this evidence be a part of the res gestae of the efforts to remove the disabilities of the minor son,

then could there be any relevant fact which would not have been res gestae? And instead of confining the cross-examination, so called, to the matters elicited in chief, we would never find a case that did not have res gestae enough to admit anything they proposed to prove. Would not this idea of the Assistant Attorney-General's theory of res gestae be a most remarkable, novel application of this doctrine? We confess that, outside of this motion for rehearing, we have never found such an extension of the doctrine. To condense: It means that the wife can be made a witness against her husband in the face of the prohibition of the statute in regard to any matter relevant to the case, whether it be germane to what she had sworn in chief or not.

It is contended, however, by the Assistant Attorney-General, that in fact the wife was not compelled to testify to any fact which was not germane to her testimony in chief; that there was merely an effort to make her testify to such facts. A very slight investigation of this record will demonstrate that several very important facts were sworn to by her, over the objection of appellant. For instance, we refer to bill of exceptions number 3, which was approved by the trial judge. The bill was reserved to the action of the court permitting the State to elicit from Mrs. Jones a great deal of testimony with reference to the transfer by herself of a large amount of property to her infant son, the day before her marriage with the defendant, and thus laying the foundation of the theory of the State in proving a motive for the killing other than that assigned by the appellant. The importance of this testimony must be conceded, for the State relied upon these matters as a motive for the killing, and for the purpose of avoiding the testimony, relied upon by the appellant, regarding the insulting conduct of Veal towards appellant's wife as the cause for the killing. Mrs. Jones had not testified for the defendant in regard to this property transaction, and it was brought out from her by the State, over appellant's objection. If appellant killed Veal on account of his supposed connection with the transfer of the property, it might be considered by the jury as an answer to Mrs. Jones' evidence in regard to the insulting conduct, and tend to show that her testimony in regard to such insulting conduct was a fabrication. Then the antagonism between the two theories was potent and sharp, the defendant relying upon what his wife and Kendall had told him with reference to the insulting conduct of Veal towards his wife, and the State relying upon the fact that the motive operating upon Jones' mind at the killing grew out of the property transaction.

2. The Assistant Attorney-General contends that this court erred in reversing the judgment because the trial court refused to permit Mrs. Jones to be corroborated by the statement of the witness Kendall, in reference to the alleged rape and insulting conduct. He says: "It is never admissible to sustain a witness by proof of general good character or otherwise, until the reputation of the witness is assailed for truth and veracity, or impeached by showing contradictory statements. These are conditions precedent to offering testimony to corroborate or sustain a

witness." The original opinion in this case does not insinuate that the State had proved that Mrs. Jones had made contradictory statements about any matter. In that opinion we never discussed the question as to whether the witness could be supported when thus attacked, to wit, by proof of contradictory statements. But, since our attention has been called to this subject, we will go further, and discuss the question as to whether a party can support his witness when thus attacked. We deemed it unnecessary to discuss this in our former opinion. Now, then, was there an effort made to show that Mrs. Jones had made contradictory statements about this matter? There was not, but there was an effort made, and it is claimed that it was successful, to show that her conduct gave the lie to the tale she told; that after this rape by Veal, etc., she visited Veal; that business relations existed between them, etc. There is no difference in the character of the attack. If the State had proved that she had made contradictory statements in regard to the matter testified to by her, every decision in this State is to the effect that she could have been supported by proof that she made the same statement to others as that sworn to on the trial. Acts speak as loud, and demonstrate the condition of the mind as effectually, as words. For what purpose was the evidence introduced, tending to show that she was on friendly terms with Veal, if it was not to establish the fact that what she had said about the insulting conduct was false? There could have been no other purpose. In fact, the evidence would not have been relevant for any other purpose in this case. This attack was as effectual, if not more so, than to have proved that she did make a contradictory statement. Being thus attacked, under all the authorities in this State, the wife could have been supported.

The Assistant Attorney-General cites us to Mr. Wharton and authorities which deny the correctness of a proposition that a witness can be supported when thus attacked. We have written a number of opinions in which we called attention to the fact that Mr. Wharton and a great many cases question or deny the correctness of the proposition. We have not invented this rule for this case, but have applied it to every case in which the question has arisen. The original opinion was based upon this proposition, found in Mr. Wharton's work on Evidence (section 570, and the same section relied on by the Assistant Attorney-General), and the rule is not questioned by any authority, to wit: "On the other hand, where the opposing case is that the witness testified under corrupt motives, or where the impeaching evidence goes to charge the witness with a recent fabrication of his testimony, it is but proper that such evidence should be rebutted. It has consequently been ruled that statements made by a witness corroborating his evidence upon the trial, such statements being uttered soon after the transaction in litigation, and at a time when the witness could not have been subject to any disturbing influences, are competent when proof has been offered to impeach him, by showing that he had recently fabricated the narrative, or that he testified corruptly." In support of this proposition, Mr. Wharton cites a

great number of authorities, common law as well as from the different States of this Union. And in the note to said text we find this: "Russell (volume 3, page 593) holds 'that the better opinion seems to be that such evidence is not admissible, except in cases where the counsel on the other side impute a design to misrepresent, from some motive of interest or relationship." And this note is supported by a great number of authorities, all of which are English cases, including as well Phillips, Starkie, and Hawkins. These excerpts from Mr. Wharton will be found in the very same section quoted and relied upon by the Assistant Attorney-General. If we had based our ruling upon the fact that Mrs. Jones was supported, because proof had been made tending to show that she had made contradictory statements, the excerpt from Mr. Wharton contained in the motion of the Assistant Attorney-General would have had some explanation. But, as before stated, the appellate courts of this State have held, in an unbroken line of decisions, that, where a witness is attacked by showing contradictory statements, the witness can be supported. We are not called upon to go back on that rule, for, as above stated, the opinion is not upon that subject. Now, will any one deny but what the State's case—the opposing case—most powerfully suggests that Mrs. Jones had fabricated her testimony to save her husband's life? There was the motive, the cause assigned, and no doubt argued with great force and effect before the jury. To meet this, appellant had the right to show that his wife did not fabricate this testimony to save her husband; that she told the same story before the killing of Veal. For the first time in this State, so far as we know, the motion for rehearing in this case questions the rule, where when a witness is attacked by showing that he testified corruptly, or had recently fabricated his testimony for a purpose, he could be supported by proof that he (witness) made the same statements before the motive could have existed, and that it was not fabricated, because he had told the same story before. In this case the motive on the part of Mrs. Jones was to save the life of her husband, if her testimony was false. This was the opposing case of the State on the trial.

3. We have no doubt of the correctness of our views in regard to proof of the general reputation of Veal as being a man of unchaste and lecherous habits, as applied to the facts of this case. By analogy, we could adduce any number of cases; for instance, the case of Horbach v. State, 43 Texas, 242. In that case Judge Roberts properly held that the general reputation of Thomas was admissible as a dangerous and violent man when drinking. That testimony was not for the purpose of excusing Horbach for killing Thomas, but for the purpose of determining the light in which Horbach had a right to view the acts and conduct of the deceased, in connection with his bad character. The same principle is applicable here. Did Jones believe what his wife told him? He had a right to look to the general reputation of Veal upon that subject; and the jury had a right to know the general reputation of Veal, in order to determine whether or not Jones believed the story told him by his wife:

4. The Assistant Attorney-General contends that the court erred in holding that the testimony of S. Q. Richardson was inadmissible, and insists that, as other witnesses testified that Mrs. Jones and Veal met on friendly terms, therefore the testimony of said Richardson was admissible. Now, Richardson does not swear that the Mrs. Jones who testified in this case, and the wife of the appellant, was the woman that he saw in Veal's office. He swears that Veal said that a certain woman who visited his office was Mrs. Dr. Jones. Suppose Veal had said that it was Mrs. Dr. Jones, the wife of Dr. R. H. Jones, this appellant; would it be contended that this would have been admissible? Would it not be hearsay testimony? If Richardson knew that Mrs. Jones, the wife of appellant, was the lady who visited Veal, and of whom he was testifying, there would be no necessity of stating what Veal said about it. If Richardson knew this witness to be the lady, and that she and Veal conversed, all that was said would have been admissible, because Richardson himself would have identified Mrs. Jones as the wife of appellant. However, he knew nothing of this himself. The State simply proved by him that a woman visited the office of Veal, and that Veal said her name was Mrs. Dr. Jones. As we have said, Veal might have told Richardson that she was Mrs. Dr. Jones, the wife of Dr. R. H. Jones, this appellant; yet, unless Richardson knew that she was the witness Mrs. Dr. Jones, all that Veal said would have been hearsay.

We have gone over the motion made for a new trial made by the Assistant Attorney-General, as well as the transcript herein, and our views have not been shaken in the least, but confirmed. The motion for rehearing filed by the State is overruled, and, in accordance with the original opinion, the judgment of the lower court is reversed, and the cause remanded.

*Motion overruled.*